IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JANEEN A. CHINN,                        )
                                    )
       Plaintiff,              )
                                      )    Case No.: 08 CV 2824
v.                                 )
                                    )    Judge Coar
ELITE RECOVERY SERVICES, INC.,    )    Magistrate Judge Ashman
                                    )
       Defendant.            )
                                    )

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(B)(6)

### I. INTRODUCTION

Plaintiff claims that Elite violated the Fair Debt Collection Practices Act, 15 U.S.C. §§1692e, 1692e(2), 1692e(5), 1692e(10) and 1692f ("FDCPA"), Illinois Collection Agency Act, 225 ILCS 425/8b ("ICAA") and Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA") by filing a lawsuit for collection of a debt from him without having an assignment that complies with §8b of the ICAA and without attaching the assignment to the collection complaint.

Plaintiff's argument fails for the following reasons:

- The "assignment for collection" provision of ICAA Section 8b does not apply to Elite because it is the owner of plaintiff's debt,

- No private right of action exists under the ICAA because the January 2008 amendments now include remedies under the ICFA for a violation of the ICAA,

- Even if the ICAA applies, it does not require an assignment be attached to the collection complaint,

- Plaintiff fails to allege actual damages as required under the ICAA and ICFA,

- The FDCPA should not be used to challenge Illinois pleading practices, and

- Defendant has not engaged in any acts in violation of the ICFA.

## II. SUMMARY OF RELEVANT ALLEGATIONS OF COMPLAINT

Elite is alleged to be engaged in the business of purchasing charged-off consumer debts and enforcing the debts against consumers. (Compl., ¶18). Elite is alleged to be a debt collector as that term is defined in the FDCPA. (Compl., ¶22). On or about April 3, 2008, Elite filed a complaint against plaintiff in the Circuit Court of Cook County. (Comp., ¶24). A copy of the state court complaint, which is referred to in plaintiff's federal complaint (Comp., ¶25), is attached hereto as Exhibit A ("Ex. A"). Elite's state court complaint was filed through its counsel Adler & Associates, Ltd., to collect a $3,309.92 credit card debt from plaintiff. (Compl., ¶24; *see also* Ex. A). Plaintiff alleges that the complaint did not attach any assignment. (Compl., ¶25). Plaintiff alleges that Elite did not have an assignment that complied with §8b of the ICAA and accordingly violated the ICAA. (Compl., ¶¶26, 45). Plaintiff claims that defendant's alleged violations of the ICAA constitute unfair and deceptive acts or practices under the FDCPA and ICFA. (Compl., ¶¶39, 50).

## III. ARGUMENT

### A. COUNT II - ICAA

#### 1. Section 8b does not apply to a debt buyer who owns the debt.

Plaintiff's theory rests on an incorrect interpretation of Section 8b of the ICAA and a misapplication of that section to debt buyers. Plaintiff wrongly claims that the ICAA was amended January 1, 2008 to "define debt buyers as 'collection agencies'" and "make[s] applicable the special assignment requirements in ICAA §8b, 225 ILCS 425/8b" to them. (Compl., ¶8). Plaintiff follows that claim with an incomplete block quotation of Section 8b (Compl., ¶9) which omits the heading of the Section- "Assignment for Collection"- and thus completely misconstrues the purpose of the provision. Contrary to plaintiff's theory, assignments <u>for</u> collection do not apply to debt buyers who purchase accounts pursuant to assignments in which all rights and ownership interest are transferred. On the contrary, assignments for collection have a long history and developed in the law as a way to permit an assignee to file suit where the assignor retained naked legal title alone. *See Sprint Communications Co., L.P., et. al. v. APCC Services, Inc., et. al.*, --- S.Ct. ----, 2008 WL 2484712, *7 (U.S. June 23, 2008)("Thus, during the 19th century, most state courts entertained suits virtually identical to the litigation before us: suits by individuals who were assignees for collection only, *i.e.*, assignees who brought suit to collect money owed to their assignors but who promised to turn over to those assignors the proceeds secured through litigation."). Not only does plaintiff's application of

Section 8b ignore the long history and meaning of the words "assignment for collection," it is inconsistent and contradictory with other provisions of Section 8 of the ICAA.

      a.       "Assignment for Collection."

The plain language of Section 8b demonstrates that it applies to assignments <u>made for the purpose of collection</u>, and not to assignments in which <u>all rights</u> are transferred to the assignee. The Supreme Court recently addressed this distinction when it considered whether an assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor. *Id* at *2. The Court discussed the history and development of assignments for collection, noting that assignments for collection are those founded on the transfer of legal title alone- not ownership. The Court stated:

The history and precedents that we have summarized make clear that courts have long found ways to allow assignees to bring suit; that where assignment is at issue, courts- both before and after the founding- have always permitted the party *with legal title alone* to bring suit; and that there is a strong tradition specifically of suits by assignees for collection. *Id.* at *11. (emphasis added).

The transfer of legal title only defines an assignment for collection. Thus, it does not transfer the "beneficial ownership" to the assignee, but it vests legal title in the assignee, empowers the assignee to collect and permits the debtor to "discharge himself by making payment to the assignee." *Ecker v Big Wheels, Inc.*, 136 Ill.App.3d 651, 654, 483 N.E.2d 639, 642 (4th Dist. 1985).[1]

Plaintiff's citation to *Business Service Bureau, Inc. v Webster*, 298 Ill.App.3d 257, 698 N.E.2d 702 (4th Dist. 1998) is consistent with defendant's interpretation of "assignments for collection" vs. assignments of ownership. (Compl., ¶8). Plaintiff cites the *Webster* case for the proposition "Illinois courts had held prior to the amendment that a party that was required to but did not have such an assignment does not have a valid claim and that the defendant in such a case is entitled to judgment." (Compl., ¶8). The *Webster* case involved a medical debt that was <u>assigned for collection</u>. The assignment at issue stated:

---

[1] *See also Schoonmaker v Lawrence Brunoli, Inc.*, 265 Conn. 210, 228, 828 A.2d 64, 80 (Conn. 2003)("under the doctrine of assignment for collection, the assignor does in fact retain an equitable ownership, and therefore, substantial rights, in the action assigned"); *DeBenedictis v Hagen*, 77 Wash.App. 284, 289, 890 P.2d 529, 532 (Wash.Ct.App. 1995)(distinguishing between an assignment in which entire ownership is transferred and an assignment for collection in which legal title only is transferred); *Stanislaus Pump, Machinery & Construction Corp.*, 200 Cal.App.3d 1442, 1447, 246 Cal.Rptr. 601 (Cal.Ct.App. 1988)("when an assignment is made for collection or as collateral security, the assignor retains the equitable interest in the thing assigned and therefore can maintain an action for its recovery.").

For valuable consideration of an agreed to percentage of the amount collected, and pursuant to the Collection Agency Agreement, the undersigned representative of ELITE MEDICAL SERVICES, hereby assigns all of its rights, title and interest in and to the following named delinquent accounts owing by the person or persons so specified to BUSINESS SERVICE BUREAU, to sue for and take all legal steps that may be deemed proper or necessary to affect collection thereof, in such company's own name. *Id* at 258.

The assignment gave Business Service Bureau the right to sue or take other legal steps to collect in its name, and if successful it only kept a contingency fee. Elite Medical Services still maintained beneficial ownership and the right to proceeds recovered. It is not surprising then, that Section 8b applied to the assignment because it was an "assignment for collection."

On the other hand, in this case, the assignment is one in which ownership interest is transferred. Plaintiff acknowledges this, alleging Elite "is engaged in the business of purchasing charged-off consumer debts and enforcing the debts against the consumers." (Compl., ¶18). Plaintiff further states that Elite is a "debt buyer" and that "Elite Financial Services, LLC claimed to have purchased the debt." (Compl., ¶¶12, 24). Further, in the collection complaint Elite alleges that it acquired plaintiff's debt "by purchase ... and is now the bona fide holder of the claim." (Ex. A ¶1).

There are no allegations that Elite filed suit against plaintiff pursuant to an <u>assignment for collection</u> or that Elite filed suit on behalf of or for the benefit of any other entity. On the contrary, the Complaint demonstrates that Elite filed suit for itself as owner of plaintiff's account.

b.    **Section 8b applies to an entity that gets legal title, not beneficial ownership.**

Section 8b states:

425/8b **Assignment for Collection**

§8b. **Assignment for collection**. An account may be assigned to a collection agency for collection with **title passing to the collection agency to enable collection of the account** in the agency's name **as assignee for the creditor** provided...

The plain language of Section 8b demonstrates that it applies to the circumstance in which legal title is passed to the collection agency to enable the agency to engage in collection activities as the <u>as assignee for the creditor</u>. *See Sprint Communications Co., L.P. v APCC Services, Inc.,* --- S.Ct. ---, 2008 WL 2484712, *2 (U.S. June 23, 2008)(holding that assignee filing suit pursuant to assignment

for collection can file suit in its own name). Regardless of how Section 8b read before the January 2008 Amendment, it does not apply to debt buyers who purchase accounts and obtain beneficial ownership.[2]

The ICAA defines "creditor" as "a person who extends consumer credit to a debtor." 225 ILCS 425/2. Defendant is not a creditor under the ICAA. Defendant purchases debt. It owns plaintiff's debt. Defendant retained a law firm to sue plaintiff to collect his unpaid debt in state court. Providian National Bank was the creditor that extended credit to plaintiff when plaintiff opened the credit card account. (Ex. A). While defendant did not extend credit to plaintiff, it acquired ownership of the debt and stepped into the shoes of the assignor for all purposes.[3] Plaintiff's interpretation makes "for the creditor" superfluous, and statutes cannot be interpreted in ways to make words superfluous.

Further, the fact that Section 8b applies only to assignments for collection in which title is transferred but not ownership is consistent with Section 8a-1 of the Act which provides in part:

> 425/8a-1. Collection action
> §8a-1. (a) No account may be referred by a collection agency to an attorney unless, prior to placing an account with an attorney for further collection action, each account creditor is notified in writing by the collection agency of the collection agency's intent to refer the account to an attorney...

Section 8a-1 and 8b address the circumstance in which a third party collection agency files suit, but ownership of the account remains with the creditor - not the circumstance in which a collection agency has acquired ownership of the debt and files suit on its own behalf. For example, it would be ludicrous to require a debt buyer who has acquired all rights to a debt pursuant to an assignment to notify the original creditor of its intent to file suit for collection of the debt. Once the account is sold pursuant to an assignment, the original creditor no longer has an interest in the

---

[2] Section 8b also does not apply where an entity refers an account (*i.e.* assigns an account) to an agency, which is specifically addressed in Section 8b(d). *See* 8b(d)("No assignment shall be required by any agreement to list a debt with a collection agency as an account for collection.").

[3] *See PRA III, LLC v Hurd*, 364 Ill.App.3d 378, 382, 846 N.E.2d 965, 968 (3rd Dist. 2006)("The assignee, by acquiring the same rights as the assignor, stands in the shoes of the assignor."); *Olvera v Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005)(pursuant to common law of assignments, assignee assumes rights as well as duties of assignor), *see also Vickey v Asset Acceptance, LLC*, 2004 WL 1510026, *2 (N.D.Ill. 2004).

account. Since Elite did not acquire plaintiff's debt pursuant to an assignment for collection, Section 8b does not apply to its collection complaint.[4]

2.    No private right of action exists under the ICAA since January 1, 2008.

Plaintiff's ICAA claim should also be dismissed because the ICAA does not provide for a private right of action. Plaintiff's citation to *Sherman v Field Clinic*, 74 Ill. App. 3d 21 (1st Dist. 1979) for the proposition that a private right of action currently exists is wrong. (Compl., ¶47)

This jurisdiction has questioned whether the former version of the ICAA should be interpreted to imply a private cause of action. *See McCabe v Crawford & Co.*, 272 F. Supp. 2d 736, 751-52 (N.D. Ill. 2003). As the Court stated in *McCabe*, 272 F. Supp. 2d at n. 16:

> The ICAA gives responsibility to the Department of Professional Regulation to enforce any violations of the ICAA and clearly contemplates enforcement through Department action. 225 ILCS 425/9(a). We are, therefore, not convinced that the ICAA should be interpreted as providing an implied private cause of action.

However, up until January 1, 2008, courts have reluctantly followed *Sherman v Field Clinic*, 74 Ill. App. 3d 21 (1st Dist. 1979), in implying a private right of action into the ICAA under certain circumstances. *See McCabe*, at 751 ("While we are not entirely convinced that the ICAA should be interpreted to imply a private right of action, we will presume for now that it does."). The reason such a right was implied was because of five factors identified in *Sherman* that supported such a conclusion. *See Kim v Riscuity, Inc.*, 2006 WL 2192121, *3 (N.D.Ill.). These factors are (1) whether the alleged action contravenes Illinois public policy; (2) whether the plaintiff is within the class of

---

[4] Plaintiff's claims against defendant are purely vicarious in challenging what documents are or are not required to be attached to a collection complaint (constructed and filed by a licensed Illinois attorney). (Compl. ¶25). Section 8b of the ICAA requires that collection suits be filed "by a licensed attorney at law," 222 ILCS 425/8b(e), but explicitly shields them from any liability in Section 2.03(5). Therefore, in alleging an assignment must be attached to the complaint, (Comp. ¶ 25), plaintiff thus challenges defendant's attorneys' conduct and attempts to vicariously implicate defendant. However, this conduct (attorneys engaged in the actual practice of law -- drafting and filing pleadings) is not intended to be regulated by the ICAA. *See Shalabi v The Huntington Bank*, 2001 WL 777055, *2-3 (N.D.Ill.)(dismissal of an ICFA claim, citing *Cripe v Leiter*, 184 Ill.2d 185 (1998)(and explaining that the Illinois Supreme Court administers a comprehensive regulatory scheme governing attorney conduct and the ICFA could not be used to do that); *Cripe v Leiter*, 184 Ill.2d 185 (1998)(holding that the ICFA did not apply to allegations of misconduct against an attorney engaged in the practice of law). Furthermore, litigants in Illinois are already granted a privilege which provides for absolute immunity against any claims regarding the manner in which pleadings are drafted and filed. *MacGregor v Rutberg*, 478 F.3d 790, 791 (7th Cir. 2007); *Ritchey v Maksin*, 71 Ill.2d 470, 476 (1978); *McNall v Frus*, 336 Ill. App. 3d 904, 906 (3d Dist. 2002); *Jorgensen v Haslinger*, 295 Ill. App. 3d 139, 141-42 (3d Dist. 1998). Under Illinois law, the only causes of action recognized for the improper drafting and filing of pleadings are malicious prosecution and abuse of process. *Havoco of America, Ltd. v Hollobow*, 702 F.2d 643, 647 (7th Cir. 1983); *Junction Solutions, LLC v MBS Dev, Inc.*, 2007 WL 4234091, *5 (N.D. Ill.); *Ray Dancer, Inc. v DMC Corp.*, 230 Ill. App. 3d 40, 47 (1st Dist. 1992); *Lyddon v Shaw*, 56 Ill. App. 3d 815, 822 (2d Dist. 1978).

individuals the statute is designed to protect; (3) whether the injury alleged is within the range of injuries the statute is designed to protect; (4) whether there is a need for a civil action for damages under the statute; and (5) and whether the statute limits the remedies available. *Kim* at *3 *citing Sherman*, 74 Ill. App. 3d at 29-30. All of the cases that have previously analyzed these five factors have done so using the pre-January 1, 2008 version of the ICAA.

However, in January 1, 2008, Illinois added Section 9.7 to the ICAA, which provides:

> Enforcement under the Consumer Fraud and Deceptive Business Practices Act. The Attorney General may enforce the knowing violation of Section 9 (except for items (1) through (9) and (19) of subsection (a)), 9.1, 9.2, 9.3, or 9.4 of this Act as an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act. 225 ILCS § 425/9.7

Section 9.7 explicitly provides for remedies that can be obtained under the ICAA, including civil damages, such as restitution through the Illinois Consumer Fraud Act, *via enforcement actions by The Illinois Attorney General*. The new Section 9.7 also explicitly limited the remedies available (knowing violations of Section 9(a)(10)-9(a)(18), and 9.1, 9.2, 9.3 and 9.4 but specifically excluding civil remedies for Section 9(a)(1)-9(a)(9) and 9(a)(19).) The prior versions of the ICAA had no such provisions for Illinois Attorney General enforcement actions and now such remedies are available to plaintiffs specifically contained within the text of the ICAA.

As a result of the January 1, 2008 amendments to the ICAA, this Court should distinguish this case from now outdated cases like *Kim* and *Sherman* and find that there is no private right of action in this instance.

Under the first factor, a court looks at whether the alleged action contravenes Illinois public policy. *Kim* at *3 *citing Sherman*, 74 Ill. App. 3d at 29-30. In *Kim*, the action alleged was that the defendant violated the ICAA in sending improper collection letters to plaintiff. *Kim* at *1. In *Sherman*, the action alleged was that the defendant violated the ICAA in sending letters and making telephone calls to plaintiff. *Sherman* at 23. The courts in *Sherman* and *Kim* held that Illinois public policy, which is specifically declared in the ICAA, (now at 225 ILCS § 425/1a), intended to provide protection from such conduct. *Sherman* at 29-30; *Kim* at *3. Therefore, the courts found that the first factor was satisfied in those cases.

In this case, the action alleged is the filing of a suit that supposedly did not have an assignment document attached to it. (Compl. ¶25, 45). As is noted above in footnote 4, section 8b of the ICAA is not (and cannot) be intended to provide protections in state court litigation. A litigant in state court has the protections of the court, the judge, and the various rules applicable to

litigation. Elite here hired counsel to file suit and thus was only exercising its right to access the civil justice system in Illinois. It would be absurd to find that this sort of action somehow contravened Illinois public policy. Clearly, the ICAA should not be construed in such a way that a private right of action is implied on behalf of private plaintiffs to sue (when they are sued) for collection of debt. This is not a harassing letter or telephone call situation. Illinois public policy should not be interpreted in such a way that it discourages the use of the court system and neither should the ICAA. Therefore, in this case, the first *Sherman* factor weighs against implying a private right of action into the ICAA.

Under the second factor, a court looks at whether the plaintiff is within the class of individuals the statute is designed to protect. *Kim* at *3 *citing Sherman*, 74 Ill. App. 3d at 29-30. In *Sherman* and *Kim*, the plaintiffs were receiving collection letters and telephone calls, which arguably placed the plaintiffs into the class of individuals the statute was designed to protect, *Sherman* at *23; *Kim* at *1.

In this case, again, plaintiff is not alleged to have received collection letters or telephone calls but rather plaintiff is a litigant defendant in a state court lawsuit. This is not the class of individuals the ICAA was ever designed to protect. The ICAA should not be interpreted as granting an implied private right of action to state court litigants and thus provide them with a collateral means to attack state court pleadings filed against them. The court system already sufficiently protects these individuals. They are not in the same situation as a consumer debtor who receives a debt collection letter or telephone call at their home. Therefore, in this case, the second *Sherman* factor also weighs against implying a private right of action into the ICAA.

Under the third factor, a court looks at whether the injury alleged is within the range of injuries the statute is designed to protect. *Kim* at *3 *citing Sherman* at 29-30. Again, in *Sherman* and *Kim*, the plaintiffs were allegedly being harassed by the manner in which collection letters and phone calls were made to them. *Sherman* at 23; *Kim* at *1. The ICAA at Section 9 lists the grounds and the types of injuries it is designed to prevent. 225 ILCS § 425/9. Injuries from receipt of collection letters and telephone calls were found to apply in *Sherman* and *Kim* based on that section of the statute. *Sherman* at 29-30; *Kim* at *3.

In this case, plaintiff is alleging injury sustained not from a letter or a telephone call but from the manner in which defendant's attorneys chose to proceed against plaintiff in state court. The ICAA is not designed to protect against such purported injuries. Again, Illinois already has a court system designed to address such conduct and protect from such "injuries," to the extent there are

any. Therefore, the third *Sherman* factor weighs against implying a private right of action into the ICAA.

Under the fourth factor, a court looks at whether there is a need for a civil action for damages under the statute. *Kim* at *3 *citing Sherman* at 29-30. This is arguably the most important and most heavily relied upon factor by *Sherman* and its progeny. Prior to January 1, 2008, there was no Section 9.7 drafted into the ICAA, which now provides for Illinois Attorney General enforcement of the ICAA through the Illinois Consumer Fraud Act. Therefore, in finding the fourth factor met in the pre-January 1, 2008 *Sherman* decision, the court stated:

> The act contains no provision for compensating debtors for their injuries and therefore provides little incentive for them to seek enforcement of the Act. Although an aggrieved debtor may derive some psychological satisfaction from the suspension or revocation of a collection agency's certificate ... from the criminal prosecution of an offending agency, it seems unlikely that most debtors will initiate and pursue their complaints through all the steps in the administrative or criminal justice processes in the absence of any tangible reward. *Sherman* at 29-30.

In other words, prior to January 1, 2008, the ICAA only provided for regulation through the Illinois Department of Professional Regulation, and even where it did, it only allowed for the "suspension or revocation of a collection agency's certificate" or other criminal type penalties. This arguably did not provide for compensation or other remedies for plaintiffs, or at the very least, did not provide an incentive for them to seek enforcement through that Department.

Section 9.7 has completely eliminated this reasoning from the discussion and has provided private individuals with a mechanism (and incentive) to obtain compensation, restitution and/or civil remedies through enforcement actions brought by the Illinois Attorney General on their behalf. The remedies available under the ICFA are broad and include restitution and civil penalties. 815 ILCS § 505/7. The January 1, 2008 addition of Section 9.7 to the ICAA has eliminated the rationale which prior courts cited in implying a private right of action in the ICAA.

Due to the inclusion of Section 9.7 into the ICAA, the fourth *Sherman* factor now weighs strongly against implying a private right of action into the ICAA. This Court should distinguish *Sherman* and *Kim* due to their analysis of older versions of the ICAA that are no longer applicable. Post-January 1, 2008, the ICAA should no longer be held to imply a private right of action when there is no such provision contained within the ICAA and where the ICAA itself sufficiently provides for remedies to private individuals through action clearly designed and intended to be taken through the Illinois Attorney General's office.

The fifth factor also supports this conclusion. Under the fifth factor, a court looks at whether the statute limits the remedies available. *Kim* at *3 *citing Sherman* at 29-30. In *Kim* and *Sherman*, because the courts were analyzing an ICAA that did not contain Section 9.7 in its current state, they held that there were no such limits in the ICAA. *Sherman* at 29-30; *Kim* at *3. Now, the result should be the opposite.

Post-January 1, 2008, Section 9.7 not only provides for new available remedies but it also explicitly limits those remedies to knowing violations of Section 9(a)(10) through 9(a)(18), and 9.1, 9.2, 9.3 and 9.4. Perhaps, more importantly, Section 9.7 specifically *excludes* civil remedies for violations of Sections 9(a)(1) through 9(a)(9) and 9(a)(19). In other words, the Illinois legislature clearly intended to provide for new remedies for plaintiffs through the ICAA but also specifically expressed its intent to exclude remedies available to plaintiffs for other specifically defined conduct. Therefore, Section 9.7 not only explicitly demonstrates intent by the legislature to define what and when remedies are available for certain specific conduct but also demonstrates intent to limit those remedies where and when it saw fit. None of this rationale applied prior to the ICAA's January 1, 2008 amendments. When applied to the fifth *Sherman* factor, this rationale now argues strongly against implying a private right of action into the ICAA.

This Court should distinguish *Sherman* and *Kim* due to their analysis of older versions of the ICAA that are no longer applicable. Post-January 1, 2008, the ICAA should not be held to imply a private right of action in regard to the alleged conduct in this case. Plaintiff's ICAA claim should be dismissed as a result.

3.   Assuming, *arguendo*, **the ICAA applies, there are no actual damages here.**

Plaintiff's ICAA claim should also be dismissed because there are no actual damages pled. The cases addressing ICAA claim hold that a private cause of action under the ICAA requires a showing of actual damages. *McCabe*, 272 F. Supp. 2d at 751 (private right of action under ICAA rejected because no actual damages); *Trull v GC Servs. Ltd., P'ship*, 961 F. Supp.1199, 1207, 1208 (N.D.Ill. 1997)(private right of action under ICAA rejected and ICAA claim dismissed because no actual damages); *Fuiten v Creditor Servs. Bureau of Springfield, Inc.*, 2007 WL 1582459, * 7 (C.D.Ill. 2006)(private right of action under ICAA rejected and ICAA claim dismissed because no actual damages); *see also Kim v Riscuity*, *2 (actual damages sufficiently pled to state ICAA claim). Here, plaintiff does not allege any actual injury and plaintiff cannot allege any actual damages were sustained -- somehow due to defendant's failure to attach an assignment document to a state court

pleading.  Certainly, no actual damages are alleged to substantiate a class ICAA claim.  Without actual damages, the ICAA is not applicable and this Court should accordingly dismiss the claim.

4.    Assuming, *arguendo*, the ICAA applies, it does not require the assignment be attached to the collection complaint.

Even if the court finds the ICAA is applicable, the ICAA contains no requirements about the form a state court pleading to collect a debt should take.  The plain language of Section 8b undermines plaintiff's theory that it (§8b) requires assignments to be attached to state court collection complaints.  On the contrary, Section 8b provides that it applies to an "assignment for collection" (Section A(1)) and it then sets forth what information the assignment documents must contain to establish the assignment is valid.  For instance, under Section 8b(a)(i) and (ii), the assignment must be evidenced by a written agreement that has an effective date and the consideration paid.  Section 8b(b) addresses how consideration must be paid.  Section 8b(c) states all assignments must be voluntary and Section 8b(d) provides that no assignment is required to list a debt with a collection agency as an "account for collection."  Section 8b(e) provides that no litigation can be filed "in the name of a licensee as plaintiff" unless certain criterion are met.  There is no provision in Section 8b that states an assignment must be attached to anything, much less a state court pleading to collect a debt.

The absence of statutory support for plaintiff's theory in the ICAA is not the only grounds for dismissal.  Under plaintiff's logic, if defendant had to attach its assignment to the state court pleading, it would attach a document that is likely thousands of pages, representing a list of accounts and account information regarding thousands of account purchased in a single portfolio.  Accordingly, defendant would have to produce not only its assignment paperwork, such as a bill of sale, but also documentation identifying the accounts that were part of the assignment.  The assignment would also have the consideration which would have to be redacted as privileged under the terms of defendant's purchase agreement.  When put into practice, plaintiff's logic here is unrealistic, burdensome, time consuming and expensive.

Plaintiff tries to support her claim that an "assignment must be attached to the complaint" by citing *Candice Co. v Ricketts*, 281 Ill. App.3d 359, 362, 666 N.E.2d 722 (1st Dist. 1996).  (Compl., ¶10).  *Ricketts* is legally and factually distinguishable because *Ricketts* is not an ICAA case, does not involve a state court pleading and does not involve a state court collection complaint.  Rather, it is a

case about a mechanics lien and the appellate court's interpretation of §7 of the Illinois Mechanic Lien Act ("MLA"). *Id.* at 360, 666 N.E.2d at 722; 770 ILCS 60/7.

In *Ricketts*, defendant Father & Son contracted with defendants Ricketts and Malone to do work at 1033 Marshall ("1033"), a property Ricketts and Malone leased. *Id.* at 360, 666 N.E.2d at 722. Father & Son did the work and assigned the rights to its mechanic lien under the contract to Candice Co. ("Candice"). *Id.* at 360, 723. Candice recorded the lien and sent copies to Ricketts and Malone. Then Candice filed suit claiming it was entitled to the mechanics lien at 1033. Defendants' successfully moved to dismiss and Candice appealed. *Id.*, 360, 723.

On appeal, the court examined the mechanics lien theory. After examining the language in the assignment of the lien from Father & Son to Candice, the court explained a contractor's assignee may file a lien claim. *Id.* at 362, 724-5. The court noted Candice did not attach the assignment to its complaint despite §2-606's[5] requirements. *Id.* at 363; 725. The court found the lien unenforceable because it did not accurately describe the parties to the contract that formed the basis of the lien in violation of §7 of the MLA, not because Candice failed to comply with §2-606. *Id.*, at 363-64, 725.

Plaintiff not only incorrectly cites §8b, but also incorrectly cites *Ricketts* to support his theory that §8b of the ICAA requires assignments to be attached to a collection complaint when *Ricketts* has no such holding. As a result, Count II should be dismissed with prejudice.

## B. COUNT I - FDCPA

The FDCPA count is premised on an alleged violation of the ICAA. There is no violation of the ICAA as discussed above. Thus, the FDCPA count should be dismissed.

Plaintiff also should not be permitted to use the FDCPA to enforce the ICAA. Federal circuit courts have rejected efforts like that plaintiff makes here to transform the FDCPA into a vehicle to enforce state laws. Plaintiff does not allege statements in the collection complaint are false or unfair, but objects to the pleading as being insufficient under the ICAA because the assignment was not attached to the state court pleading. *See Rice v. Great Seneca Financial Corp.* – F.Supp.2d--, 2008 WL 2169162, *5 (S.D.Ohio May 21, 2008)("Conspicuously absent from plaintiff's analysis is any FDCPA case law supporting her contention that such a procedural challenge to a

---

[5] Section 2-606 provides: "If a claim or defense is founded upon a written instrument, a copy thereof, or of so much of the same as is relevant, must be attached to the pleading as an exhibit or recited therein, unless the pleader attaches to his or her pleading an affidavit stating facts showing that the instrument is not accessible to him or her. In pleading any written instrument a copy thereof may be attached to the pleading as an exhibit. In either case the exhibit constitutes a part of the pleading for all purposes." 735 ILCS 5/2-606.

state court pleading-i.e.-, the failure to attach all of the original creditor's documents-violates 15 U.S.C. §§1692e, 1692e(10) or 1692f"). These alleged violations of Illinois law do not amount to FDCPA claims under federal law.

The court's decision in *Beler v Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 472 (7th Cir. 2007) demonstrates the flaw in plaintiff's FDCPA theory based on the ICAA and the ICFA's applicability to collection complaints filed in state court. There, GE Capital Corporation retained Blatt to file a collection suit against plaintiff to collect on her JCPenney debt. *Beler*, 480 F.3d at 472. The complaint identified GE Capital Corporation as "GE Capital." *Beler*, at 472. Beler sued Blatt alleging the complaint and supporting affidavit violated §1692e because their description of the contracts among the JCPenney, Monogram Bank and GE Capital was "not clear enough to enable an unsophisticated consumer to understand the relationship among the merchant, transaction processor and creditor." *Id.* Summary judgment was affirmed for the debt collector law firm, holding:

> Section 1692e does not require clarity in all writings... A rule against trickery differs from a command to use plain English and write at a sixth-grade level. <u>Beler does not contend that the complaint was deceptive and that [Blatt] set out to trick her into paying money she does not owe, or to mislead her into paying the wrong person. Whatever shorthand appeared in the complaint – the payments system through which credit card slips flow is complex, and even many lawyers don't grasp all of its details - was harmless rather than an effort to lead anyone astray.</u> *Id.*, at 473. (emphasis added).

The Seventh Circuit went on to reject plaintiff's §1692f claim that it is "unfair" or "unconscionable" for a debt collector to violate any other rule of positive law," and specifically held that "§1692f creates its own rules (or authorizes courts and the FTC to do so); it does not so much as hint at being an enforcement mechanism for other rules of state or federal law." *Id.*, at 473-4. Thus, an FDCPA claim cannot be premised solely on the basis that a state law was violated. [6]

The *Wade v Regional Credit Ass'n*, 87 F.3d 1098, 1099 (9th Cir. 1996) decision supports *Beler*. In *Wade*, a collection agency sent a collection letter to a debtor in Idaho, a state in which the agency

---

[6] *See Carlson v First Revenue Assurance*, 359 F.3d 1015, 1018 (8th Cir. 2004)("The FDCPA was designed to provide basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation."); *Harvey v Great Seneca Fin. Corp., et al.*, 453 F.3d 324, 330-31 (6th Cir. 2006)("Even when viewed from the perspective of the unsophisticated consumer, the filing of a debt-collection lawsuit... ..does not have the natural consequence of harassing, abusing or oppressing the debtor. Any attempt to collect a defaulted debt will be unwanted... but employing the court system... cannot be said to be an abusive tactic under the FDCPA.").

lacked a state-mandated collection license. The court noted that it had to determine whether violation of Idaho law constituted a violation of the FDCPA as follows:

> All of Wade's claims are based on the call from California and the notices sent to Idaho without a state permit. Idaho law prohibits persons from engaging in "either directly or indirectly in this state in the business of collecting or receiving payment for others of any account, bill, claim or other indebtedness" without obtaining a permit. Although RCA may have contravened this provision, we must determine not whether RCA violated the state statute, but whether it violated the federal Act. We disagree with Wade that debt collection practices in violation of state law are per se violations of the FDCPA. *Id.* at 1100.

In finding that violation of Idaho law did not violate the FDCPA, the court found that the violations of state law were "innocuous" and not threatening, false, unfair or unconscionable.

Similarly, in *Olvera v Blitt & Gaines*, 431 F.3d 285 (7th Cir. 2005), the Seventh Circuit rejected plaintiff's claim against a debt buyer for charging interest that was authorized by the credit agreement but allegedly higher than the ceiling imposed by an Illinois statute (815 ILCS §205/5) holding that it was a "stretch, and not merely semantically; it makes the federal statute a vehicle for enforcing a state law, and why would Congress want to do that?" *Id.*, at 287.

Plaintiff's allegations, if taken to their logical conclusion, ask this court to find automatic FDCPA liability for any claim to recover a credit card debt wherein the assignment is not attached to the state court pleading. But the FDCPA does not provide a federal remedy for claims stemming from collection suits. Instead, the FDCPA prohibits and polices collection practices that are in themselves unfair or false. Here, Elite engaged in no such practice.

## C. COUNT III - ICFA

Plaintiff's claim brought pursuant to the ICFA should also be dismissed. As is argued above, plaintiff is challenging what is or is not attached to a collection complaint filed by an attorney. (*Supra* footnote 4). Plaintiff does not allege any active or direct conduct on the part of defendant in drafting or filing the pleading nor does plaintiff allege any active or direct conduct as to defendant period.

Illinois does not allow for vicarious or derivative liability under the Illinois Consumer Fraud Act. *Costa v Mauro Chevrolet, Inc.*, 390 F. Supp. 720, 733 (N.D. Ill. 2005); *Jackson v South Holland Dodge, Inc.*, 197 Ill.2d 39 (2001); *Zekman v Direct Am Marketers, Inc.*, 182 Ill.2d 359 (1988). Liability must be premised on direct participation in the allegedly deceptive act and derivative or vicarious liability is not permitted. *Id.*

Furthermore, the ICFA does not apply to the acts of attorneys. *Shalabi v The Huntington National Bank*, 2001 WL 777055 (N.D. Ill.); *Cripe v Leiter*, 184 Ill.2d 185 (1998). Therefore, it is inconsistent for plaintiff to allege that defendant is liable under the ICFA for acts of its attorneys when the attorneys cannot be liable themselves and defendant cannot likewise be derivatively liable.

Finally, in order to state a claim under the ICFA, a plaintiff must demonstrate: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." and these elements "must be pled with the same particularity and specificity as that required under common law fraud." *Villasenor v American Signature, Inc.*, 2008 WL 904888, *3 (N.D.Ill.) *citing Oliveira v Amoco Oil Co.*, 201 Ill.2d 134, 149 (2002). Plaintiff has failed to allege (with particularity and specificity) a deceptive act or practice by defendant. Plaintiff has also failed to allege (with particularity and specificity) intent or actual damages.

It strains credulity to suggest that defendant, which retained licensed attorneys to draft and file collection complaints on its behalf, engaged in a deceptive act, *with intent*, in regard to the manner in which pleadings were drafted and filed (by defendant's attorneys) in Illinois state court collection cases. Plaintiff also fails to allege how she sustained actual damages as a result. For these reasons, this Court should dismiss plaintiff's ICFA claim.

Respectfully submitted,

By: s/Todd P. Stelter
    One of the Attorneys for Defendant,
    Elite Recovery Services, LLC

David M. Schultz
Todd P. Stelter
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JANEEN A. CHINN,                          )
                                          )
                Plaintiff,                )
                                          )
                                          )     Case No.: 08 CV 2824
v.                                        )
                                          )     Judge Coar
ELITE RECOVERY SERVICES, INC.,            )     Magistrate Judge Ashman
                                          )
                Defendant.                )
                                          )

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2008, I electronically filed **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(B)(6)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

**Dan Edelman**
dedelman@edcombs.com

                              Respectfully submitted,




                              By:_____s/Todd P. Stelter_____


David M. Schultz
Todd P. Stelter
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Ste 300
Chicago, IL 60601
(312) 704-3000

# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT

| | | |
|---|---|---|
| RECOVERY SERVICES S/I/I TO | ) | Case No. |
| IDIAN NATIONAL BANK | ) | Contract |
| | ) | |
| Plaintiff, | ) | |
| | ) | Amount Claimed $3,309.92 |
| | ) | Plus attorney fees and costs |
| ANEEN A CHINN | ) | |
| | ) | Return Date: |
| Defendant(s) | ) | **MAY 0 8 2008** |

## VERIFIED COMPLAINT AT LAW

NOW COMES the Plaintiff, ELITE RECOVERY SERVICES S/I/I TO PROVIDIAN NATIONAL BANK, by and through its attorneys, ADLER & ASSOCIATES, LTD., and for its complaint against the Defendant(s), JANEEN A CHINN   , alleges and states as follows:

1. That Plaintiff acquired by purchase assignment from the original credit issuer or its successor the account of Defendant(s) JANEEN A CHINN   , and is now the bona fide holder of this claim.

2. That upon information and belief from the representations of the assignor, at the specific instance and request of the Defendant(s), JANEEN A CHINN   , PROVIDIAN NATIONAL BANK , directly or through a retail merchant , issued to Defendant(s) a certain credit card/revolving charge (open end consumer credit) account.

3. That upon information and belief Defendant(s) made various charges to said account since the date of issuance and, after accounting for payments made, there remains an unpaid and past due balance in the sum of $3,309.92, as set forth in the attached affidavit.

4. That demand for payment has been made upon the Defendant(s) but Defendant(s) has/have failed or refused to pay said remaining balance.

5. That Plaintiff claims reasonable attorneys' fees in the sum of $350.00, as provided for in Exhibit(s).

WHEREFORE, Plaintiff, ELITE RECOVERY SERVICES S/I/I TO PROVIDIAN NATIONAL BANK, prays judgment be entered in its favor and against the Defendant(s), JANEEN A CHINN   , in the amount of $3,309.92, plus applicable attorney fees and costs.

ADLER & ASSOCIATES, LTD.

BY:_____
     For the Firm

ADLER & ASSOCIATES, LTD., #00512
ATTORNEYS FOR PLAINTIFF
25 E. WASHINGTON, #500
CHICAGO, IL 60602
312 726-1814
218578



EXHIBIT

A

# AFFIDAVIT

**STATE OF NEW YORK}**

**COUNTY OF ERIE}**

BEFORE ME, the undersigned Notary Public, authorized by law to administer oaths, personally appeared Richard Corica, who, after being first duly sworn, says:

1. I am a duly authorized officer of Elite Recovery Services Inc., and am authorized to make this oath on behalf of Elite Recovery Services Inc. accordingly.

2. I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth herein.

3. In the capacity of my employment, I maintain the books and records of Elite Recovery Services Inc. and have personal knowledge that said records are kept in the ordinary course of business and it is the regular practice to record such transactions on or about the time of occurrence.

4. That at the time of purchase, Providian transmitted certain electronic data pertaining to the particulars of the indebtedness of CHINN, JANEEN A. A true and accurate printout of such relevant electronic data is attached hereto, identified as the "Statement of Account".

5. I have reviewed the books and records of Elite Recovery Services Inc. with respect to the indebtedness of CHINN, JANEEN A (SSN# XXX-XX- 3576) and the books and records of Elite Recovery Services accurately reflect incorporated by reference herein.

6. That Elite Recovery Services Inc. is a bona fide assignee of Providian, the original creditor of the indebtedness of CHINN, JANEEN A set forth above, pursuant to a valid purchase agreement.

7. I affirm that CHINN, JANEEN A is responsible for payment of interest at the applicable state legal interest rate per annum.

8. I affirm that if I was to be called as a witness, I can testify competently as to the facts of the indebtedness of CHINN, JANEEN A.

9. To the best of my knowledge, the defendant is not now on active duty in a branch of the military.

_____
Affiant's Signature

SUBSCRIBED AND SWORN TO before me, a Notary Public, in and for Erie County and New York State, this 16th day of January, 2008.

Notary Public

My Commission Expires:

JILL S. ANDERSON
Notary Public, State of New York
Qualified in Erie County
My Commission Expires July 21, 20 11

Ref#:  389631

218578

===================================================================
                      Statement of Account          06-7482
===================================================================
**Original Creditor: Providian**
===================================================================
Collections Department: 800-780-6165

Mail Payments to:          ERS
                           PO BOX 3474
                           Buffalo, NY 14240-3474

===================================================================

ERS Account Number:                389631
Current Statement date:            1/15/2008
Original Account Number:           4185512900035752
Placement Balance:                 $3,309.92
Interest:                          $0

TOTAL AMOUNT DUE:                  $3,309.92

===================================================================

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AND IS AN ATTEMPT TO
COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT
PURPOSE.

===================================================================
           ******Total Amount Due: **$3,309.92**
===================================================================

CHINN, JANEEN A
10457 S PARNELL AVE
389631
CHICAGO, IL 606282433

Elite Recovery Services Inc.
PO BOX 3474
Buffalo, NY 14240-3474

# PROVIDIAN
Financial

Providian National Bank WebCard® VISA
Account Agreement

Please review this document and keep it with your other important papers. This Account Agreement contains the terms which govern your Providian National Bank VISA or MasterCard Account (the "Account"). The Account allows you to make purchases by using your VISA or MasterCard card (the "Card") wherever it is honored and to get cash advances from us or any other participating financial institution and from Automated Teller Machines. Convenience checks may also be provided to you as an additional way to use the Account. In this Agreement, "you" and "your" mean each person for whom we have opened a credit card Account. "We," "our," "ours," and "us" mean Providian National Bank or its assignees, as listed on your billing statement. The Account may be used only for personal, family, household, and charitable purposes, and not for any business or commercial purpose. Any use of this Account shall constitute acceptance of the terms of this Agreement.  You and we agree as follows:

**Payments.** You will receive a monthly statement showing your outstanding balance. Payment on this Account is required in U.S. dollars (checks must be payable at a U.S. office of the bank the check is drawn on) for at least the payment due as shown on your statement by the payment due date in accordance with payment instructions on your monthly statement. The back of your statements shows the rules we follow when we post payments. Convenience checks and other checks we issue to you may not be used to make payments on your Account or to make payments on any other account you have with us or our affiliates. The payment due will be: 2% of the new balance shown on your statement  plus the amount of any past due payment, and may include the amount by which the new balance exceeds your credit line. However, the payment due will not be less than $15 (unless your new balance is less than $15, in which case the payment due will be the amount of the new balance). If your Account is past due or above the credit line, we may require a higher minimum payment, but we will notify you before doing so. If your payment is more than the payment due, it will be treated as a single payment and none of it will be applied to future payments due. We may accept late or partial payments, or payments marked "paid in full" or marked with other restrictions, without losing our right to collect all amounts owing under this Agreement.

**Finance Charges.** Except as described in the Grace Period for Purchase Balance section of this Agreement, finance charges begin to accrue on a debit when it is included in one of your daily balances and continue until that balance is reduced by a payment or credit. Your Account has the following balances: The **Purchase Balance**, which consists of your existing Purchase Balance and new purchases you make with your Card and fees for certain optional services, one or more **Custom Cash Advance Balances**, which consists of balances that you transfer to your Account using balance transfer checks and balances that we transfer to you, and the **Cash Advance Balance** which consists of all other cash advances and cash advance transaction fees. Any payment amount we receive that exceeds the finance charges and fees then due will ordinarily be applied first to the Balance with the lowest Annual Percentage Rate (APR), until that Balance is zero, and then to the Balance with the next lowest APR, until that Balance is zero, and then to any remaining Balance. We reserve the right to apply payments differently without further notice.

The Purchase, Custom Cash Advance, and Cash Advance Balances are reduced by payments as of the date received, and by credits as of the date posted. Purchases are included in your Purchase Balance as of the date made.  Custom cash advances are included in your Custom Cash Advance Balance as follows:  funds electronically transmitted to other lenders to transfer balances, as of the date transmitted; checks to transfer balances, as of the date presented to us.  Other cash advances are included in your Cash Advance Balance as follows:  cash advances from other financial institutions and through Automated Tellers, as of the date made; cash advance checks made payable to you that are offered as cashier's checks and mailed to you at your request, as of seven days after the date we print on the check; all other checks, as of the date presented to us.  Other debits are included in your Purchase, Custom Cash Advance, or Cash Advance Balance as of the date posted.  Finance charges are added to your Purchase, Custom Cash Advance, and Cash Advance Balances each day and are then posted on the last day of the billing cycle.  There is no grace period for custom cash advances or other cash advances.

To figure the daily finance charge for each type of Balance, we start with your previous day's Balance, add all debits and subtract all credits for the current day and multiply the net amount by the applicable daily periodic rate (see following paragraphs).  The finance charge for each type of Balance is then added to and included in that day's Balance.  We treat a credit balance for any day as zero.  We determine the total finance charges on balances for the billing cycle by adding together the finance charges for each type of Balance for each day within the billing cycle.  In calculating finance charges, an adjustment will be made for any transaction or payment that would have affected the finance charge calculation in a prior billing cycle had it been posted in that cycle.  The applicable daily periodic rate for such a transaction will be the rate in effect for the current billing cycle rather than the rate in effect on the date of the transaction.

Your statement includes an average daily balance for each type of Balance.  You can multiply each average daily balance that is not zero by the number of days in the billing cycle and the periodic rate to obtain subtotals, and then add the subtotals together to determine your total finance charges on balances for the billing cycle.  If a cash advance transaction fee is charged, that amount is also a finance charge.

The term "Prime Rate" as used in the Agreement means the highest prime rate published in the *Wall Street Journal* on the first business day of the previous calendar month.  Any increase or decrease in the Annual Percentage Rate will take effect on the first day of your billing cycle and may result in a slight increase or decrease in the amount of your minimum payment.

The **ANNUAL PERCENTAGE RATE (APR)** for purchases may vary and will be adjusted each billing cycle to 10.24% above Prime Rate, but will in no event be less than 17.99%.  Using this formula, the APR for purchases in the October 2000 billing cycle is 19.74%, corresponding to a daily periodic rate of 0.05408%.

The **ANNUAL PERCENTAGE RATE** for cash advances is 19.99%, corresponding to a daily periodic rate of 0.05477%.

If we receive your Account payment late 2 or more times in any 6-month period, on each such occurrence we may increase the APR for purchases up to a maximum of 23.30% (corresponding to a daily periodic rate of 0.06384%), and increase the APR for cash advances and custom cash advances up to a maximum of 23.30% (corresponding to a daily periodic rate of 0.06384%).  If after you receive the higher rates your payments are received on time and you meet all other terms of this Agreement for 3 consecutive months, you may contact our Customer Service department and, at your request, we will review your Account for a possible APR reduction.

**Grace Period for Purchase Balance.**  New purchases posted to your Account in billing cycles with no previous balance, or when the previous balance was fully paid during the cycle, do not begin to incur a finance charge until the start of the next billing cycle.  You will pay no finance charge on such new purchases if you pay the total new balance in full by the payment due date shown on your statement.  New purchases posted in any other billing cycle incur a finance charge, and there is no period in which such purchases are repaid without incurring a finance charge.

**Rebate**  On the last day of each monthly statement period we will credit your Account with 1% of your net purchase transactions posted during the statement period.  "Net Purchase Transactions" means Card purchases, less purchase adjustments and purchase credits posted during the period.

**Fees.**  We may charge your Account $0 for  each Card you ask us to replace; each returned payment; each check you write on your Account that we return unpaid; each stop payment order or renewal of such an order; each billing cycle within which your Account is delinquent (late charge); and each billing cycle within which your balance exceeds your credit line (overlimit fee)  even if your Account is closed.  If you request copies of billing statements that were first sent to you more than three months earlier, we may charge a handling fee of $2 for each such copy.  If you request that we make a one-time automatic

...ur personal checking account, we may charge your credit card account a fee of $4.95 for each request. This fee is a **FINANCE CHARGE**, ...a transaction fee of 3% (minimum $5), which is a one-time **FINANCE CHARGE**, on the amount of each cash advance, including cash from ...tions, and ATMs, wire transfers, money orders, lottery tickets, casino gaming chips, and similar transactions.

...will be in default: if any information you provided us proves to be incomplete or untrue; if you do not pay other debts when due; if a bankruptcy petition is filed by or against you; or if we believe in good ...you may not pay or perform your obligations under this Agreement. If you are in default we may, without further demand or notice, cancel your ...leges, declare your Account balance immediately due and payable, and use any remedy we may have. In the event of your default, the ...balance on your Account shall continue to accrue interest at the APR(s) disclosed in the Finance Charges section of this Agreement, even if we ...suit to collect the amount you owe.

...Line. Your credit line is specified from time to time in a separate notice. Your monthly statements show your credit line and the amount of your ...le credit. We may increase or decrease your credit line based on information we obtained from you or your credit records. Your available credit is ...ly the difference between your credit line and your Account balance (including transactions made or authorized but not posted). If you send us a ...payment check, we may limit your available credit while we confirm that the check will clear. For certain transactions, available credit may be less. ...will not use your Account for, and we may refuse to honor, any transaction which would cause you to exceed your available credit.

...mise to Pay. You promise to pay us when due all amounts borrowed when you or someone else use your Account (even if the amount charged ...eeds your permission), all other transactions and charges to your Account, and collection costs we incur including, but not limited to, reasonable ...ney's fees and court costs. (If you win the suit, we will pay your reasonable attorney's fees and court costs.)

...anges. After we provide you any notice required by law, we may change any part of this Agreement and add or remove requirements. If a change is ...the change. Changes will apply to balances that include items posted to your Account before the date of the change, and will apply whether or not you ...ntinue to use the Account.

...reign Exchange/Currency Conversion. If you use your Card for transactions in a currency other than U.S. dollars, the transactions will be converted to ...S. dollars, generally using either a (i) government-mandated rate or (ii) wholesale market rate in effect the day before the transaction is processed, ...reased by three percent (3%). If a credit is subsequently given for a transaction, it will be decreased by the same percentage. The currency conversion ...be used on the conversion date may differ from the rate in effect on the date you used your Card. You agree to accept the converted amount in U.S. ...ollars.

...the Card; Cancellation. You may cancel your credit privileges at any time by notifying us in writing and destroying the Card(s). Upon the Card expiration at ...e end of the month shown on it, we reserve the right not to renew the Card. We may cancel the Card and your credit privileges at any time after 30 days ...otice to you, or without notice if permitted by law. If your Card is cancelled or not renewed, finance charges and other fees will continue to be assessed, ...ayments will continue to be due, and all other applicable provisions of this Agreement will remain in effect. If you terminate your credit privileges, or if we ...ncel or do not renew the Card, you may no longer write checks on your Account, and you should destroy any unused checks we have issued to you.

...ersonal Information; Documents. You will provide us at least 10 days notice if you change your name, home or mailing address, telephone numbers, ...employment or income. Upon our request, you will provide us additional financial information. We reserve the right to obtain information from others, ...luding credit reporting agencies, and to provide your address and information about your Account to others. We may also share information with our ...iliates. However, you may write to us at any time instructing us not to share credit information with our affiliates. If you do not fulfill your obligations under ...s Agreement, a negative credit report that may reflect on your credit may be submitted to the credit reporting agencies

...stomer Service; Unauthorized Use, Loss, or Theft of Checks or the Card. Each Card must be signed on receipt. You are responsible for ...eguarding the Card, your Personal Identification Number ("PIN", which provides access to Automated Teller Machines) and any checks issued to you ...m theft, and keeping your PIN separate from your Card. If you discover or suspect that your Card, PIN, or any unused checks are lost or stolen, or that ...d liability, you will phone us even though you may also notify us in writing. You will not be liable for unauthorized use occurring before you notify us of a ...s or theft. If you report or we suspect unauthorized use of your Account, we may suspend your credit privileges until we resolve the problem to our ...isfaction or issue you a new Card. If your Card is lost or stolen, you will promptly destroy all checks in your possession. To improve customer service ...d security, you agree that your calls may be monitored or recorded.

...rchant Relations. We will not be liable if any person or Automated Teller Machine refuses to honor the Card or accept your checks, or fails to return the ...rd to you. We have no responsibility for goods and services purchased with the Card or checks except as required by law. (See Special Rule below.) ...rtain benefits that are available with the Account are provided by third-party vendors. We are not responsible for the quality, availability, or results of any ...the services you choose to use.

...p Payment Orders. If you wish to stop payment on a check, you may send us a stop payment order by writing to us at our address for customer service ...ed on your statement. You can make a stop payment order orally by calling the number listed on your statement. When you make a stop payment order, ...must provide your Account number and specific information about the check: the exact amount, the date on the check, the name of the party to whom it ...payable, the name of the person who signed it, and the check number. You will be asked to confirm an oral stop payment order in writing. We may ...regard your oral order if we do not receive a signed written confirmation within two weeks after the oral order, or if we have not received an adequate ...cription of the item so that payment can be stopped. The order will not be effective if the check was paid by us before we had a reasonable opportunity to ...on the order. We may, without liability, disregard a written stop payment order six months after receipt unless it is renewed in writing.

...ndard of Care. Because this Account involves both credit card and check transactions which are processed through separate national systems before ...transactions are consolidated by us, and because not every check and Card slip will be sent to us, transactions in your Account will be processed ...chanically without our necessarily reviewing every item. Our processing system will call our attention to certain items which we will examine. We will ...mine all transactions when you report that your Card or checks have been lost or stolen. We do not intend ordinarily to examine all items, and we will not ...negligent if we do not do so. This rule establishes the standard of ordinary care which we in good faith will exercise in administering your Account. ...cause of our limited review, and because neither your cancelled checks nor Card transaction slips will be returned to you with the monthly statement, you ...uld be careful to enter all checks in your check register or otherwise keep a record of them. You should also save your credit card cash advance and ...chase slips. You agree to check your monthly statements against your record and to notify us immediately of any unauthorized transactions or errors.

...iver of Certain Rights. We may delay or waive enforcement of any provision of this Agreement without losing our right to enforce it or any other ...vision later. You waive: the right to presentment, demand, protest, or notice of dishonor; any applicable statute of limitations; and any right you may ...e to require us to proceed against anyone before we file suit against you.

...plicable Law; Severability; Assignment. No matter where you live, this Agreement and your Account are governed by federal law and by New ...mpshire law. This Agreement is a final expression of the agreement between you and us and may not be contradicted by evidence of any alleged oral ...eement. If any provision of this Agreement is held to be invalid or unenforceable, you and we will consider that provision modified to conform to applicable ...and the rest of the provisions in the Agreement will still be enforceable. At any time after we determine in good faith that any proposed or enacted ...slation, regulatory action, or judicial decision has rendered or may render any material provisions of this Agreement invalid or unenforceable, or impose ...increased tax, reporting requirement, or other burden in connection with any such provision or its enforcement, we may, after at least 30 days notice to ...or without notice if permitted by law, cancel the Card and your Credit privileges. We may transfer or assign our right to all or some of your payments. If

**PROVIDIAN**
*Financial*

...aw requires that you receive notice of such an event to protect the purchaser or assignee, we may give you such notice by filing a financing statement ...he state's Secretary of State.

...ces. Other notices to you shall be effective when deposited in the mail addressed to you at the address shown on our records, unless a longer notice ...od is specified in this Agreement or by law, which period shall start upon mailing. Notice to us shall be mailed to our address for customer service on ...r statement (or other addresses we may specify) and shall be effective when we receive it.

...UR BILLING RIGHTS – KEEP THIS NOTICE FOR FUTURE USE. This notice contains important information about your rights and our responsibilities under the Fair ...redit Billing Act.

*Notify Us in Case of Errors or Questions About Your Bill.* If you think your bill is wrong or if you need more information about any transaction on your bill, write us on a separate sheet, at the address listed in the Billing Rights Summary on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information: – Your name and Account number. – The dollar amount of the suspected error. – Describe the error and explain, if you can why you believe there is an error. If you need more information, describe the item you are not sure about.

f you have authorized us to pay your credit card bill automatically from your checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities After We Receive Your Written Notice.* We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct. After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

f we find that we made a mistake on your bill, you will not have to pay any finance charge related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up the missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you question your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is. If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases.* If you have a problem with the quality of the property or services that you purchased with our credit card and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services. There are two limitations on this right: (a) you must have made the purchase in your home state, or if not within your home state, within 100 miles of your current mailing address; and (b) the purchase price must have been more than $50. These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.